## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| JAMES HICKS, LADARRIOUS LOGAN, LARSON SCOTT, and ALFRED JOHNSON,<br><br>Plaintiffs,<br><br>v.<br><br>THE OVERSEER PROTECTIVE SERVICES, LLC, and MARTIN WILLIAMS,<br><br>Defendants. | CIVIL ACTION FILE NO.<br><br>_____<br><br>**JURY TRIAL REQUESTED** |

## COMPLAINT
## AND DEMAND FOR JURY TRIAL

COME NOW, Plaintiffs James Hicks, Ladarrious Logan, Larson Scott and Alfred Johnson, by and through their undersigned counsel, and hereby bring this action against Defendants The Overseer Protective Services, LLC, and Martin Williams.

## NATURE OF THE ACTION

1.      Plaintiffs James Hicks, Ladarrious Logan, Larson Scott and Alfred Johnson (collectively "Plaintiffs") bring this action under the Fair Labor Standards Act ("FLSA") of 1938, as amended, 29 U.S.C. § 201 et seq., alleging that The Overseer Protective Services, LLC, and Martin Williams (collectively

1

"Defendants"): (1) willfully failed to pay Plaintiffs minimum wage for all hours worked and (2) willfully failed to compensate Plaintiffs at time and one-half for all hours and parts of hours worked in excess of forty (40) hours per week.

2.    Defendants are liable, jointly and severally, to Plaintiffs for all unpaid minimum and overtime wages, an equal amount of liquidated damages, and reasonable costs and attorneys' fees.

## PARTIES

3.    Plaintiff James Hicks is a citizen of Georgia who resides in Fulton County, Georgia.

4.    Plaintiff Ladarrious Logan is a citizen of Georgia who resides in Clayton County, Georgia.

5.    Plaintiff Larson Scott is a citizen of Georgia who resides in Clayton County, Georgia.

6.    Plaintiff Alfred Johnson is a citizen of Georgia who resides in Houston County, Georgia.

7.    Defendant Protective Services is a limited liability company organized and existing under the laws of the State of Georgia, with its principle place of business located at 5300 Memorial Drive, Suite 142, Stone Mountain, Georgia, 30083.

8.      Defendant Williams is the Chief Executive Officer, Chief Operating Officer, shareholder, and co-owner of Defendant Protective Services.

9.      Defendant Protective Services may be served with process by delivering a copy of the Complaint and Summons to its registered agent, Horace Mann II, at 5300 Memorial Drive, Suite 142, Stone Mountain, Georgia, 30083.

10.     Defendant Williams may be served with process personally at his home address, at his office address, or wherever he may be found. Alternatively, Defendant George may be served with process by leaving a copy of the Summons and Complaint with someone of suitable age and discretion residing at his home address.

## JURISDICTION AND VENUE

11.     This Court has jurisdiction of Plaintiffs' claims pursuant to 28 U.S.C. § 1331.

12.     Defendant Protective Services is subject to personal jurisdiction in the State of Georgia for purposes of this lawsuit because it is a citizen of the forum state.

13.     Venue is proper pursuant to 28 U.S.C § 1391(b) and Local Rule 3.1(B)(3) in the Atlanta Division of the Northern District of Georgia because Defendants reside within this Judicial District and Division.

14.     Defendants employed Plaintiffs, who were engaged in interstate commerce, in the production of goods for commerce, and/or handled, sold, or otherwise worked on goods or materials that have been moved in or produced for commerce.

15.     On information and belief, Defendant Protective Services has had at all times relevant an annual gross volume of sales made or business done in excess of $500,000.

### "MATERIALS" USED BY PLAINTIFFS WHILE ON DUTY

16.     Plaintiffs were armed and unarmed security guards required to carry a cell phone and flashlight while on duty.

17.     Imposed on armed security guards was the additional requirement to carry a firearm and handcuffs while on duty.

18.     Plaintiffs patrolled various entities either on foot and/or using their own vehicles, which were filled with gas obtained from commercial gas stations.

19.     Plaintiffs carried and used personal cell-phones while on duty.

20.     Plaintiffs routinely and regularly handled their firearms and handcuffs to perform their duties.

21.     Upon information and belief, these articles were produced outside of the State of Georgia.

22.     Plaintiffs carried a combination of these articles at all times while performing work.

23.     Plaintiffs' firearms, handcuffs, vehicles, cell-phones, and flashlights were articles necessary to providing security services to Protective Services' clients.

24.     Plaintiffs' firearms, handcuffs, vehicles, cell-phones, and flashlights are "materials" within § 203(s)(1)(A)(i) of the FLSA.

### FACTUAL ALLEGATIONS SHOWING THAT DEFENDANT CORPORATE OFFICER MARTIN WILLIAMS IS AN EMPLOYERS UNDER THE FLSA

25.     At all times relevant, Defendant Williams qualified as an "employer" under 29 U.S.C. § 203(d).

26.     Upon information and belief, Protective Services is owned and operated by a group of certified security professionals.

27.     At all times relevant, Defendant Williams held, and continues to hold, a significant ownership interest in Protective Services, which has been, and continues to be, engaged in interstate commerce and/or the production of goods for commerce within the meaning of the FLSA.

28.     At all times relevant, Defendant Williams acted directly and indirectly in the interest of Defendant Protective Services in relation to Plaintiff employees.

29.     At all times relevant, Defendant Williams exercised day-to-day control over the affairs of Defendant Protective Services, including: approving promotions and raises; hiring and discharging employees; and establishing other terms and conditions of employment.

30.     For example, Defendant Williams is responsible for interviewing and screening applicants interested in working at Protective Services.

31.     Defendant Williams interviewed and hired Plaintiff Hicks.

32.     In fact, Defendant Williams informed Plaintiff Hicks that he would receive a pay raise after one full month of employment at Protective Services.

33.     At all times relevant, Defendant Williams had, and continues to have, a significant involvement in the supervision and payment of Plaintiff employees.

34.     Defendant Williams directly and indirectly controlled, determined, and directed the day-to-day operations of Defendant Protective Services.

35.     For example, Defendant Williams was responsible for payroll, accounting, and invoicing.

36.     Defendant Williams determined the rate and method of payment for Plaintiffs.

37.     Among the persons listed under the "Contact Us" section of Defendant's online website is Defendant Williams. He is listed as the "Director of Operations."

6

38.     Upon information and belief, Defendant Williams divided and assigned work assignments, and oversaw scheduling and compensation.

39.     Upon information and belief, Defendant Williams had the ultimate power to make binding policy decisions for Defendant Protective Services.

## **FACTUAL ALLEGATIONS COMMON TO EACH COUNT**

40.     Plaintiff Hicks was employed by Defendants on or about October 2011, to approximately December 10, 2011, as a uniformed, unarmed security guard.

41.     Monday through Sunday, Plaintiff Hicks generally worked either a shift that began at 12:00 a.m. and concluded at 8:00 a.m. or a shift that began at 11:00 p.m. and concluded at 7:00 a.m.

42.     Defendants promised Plaintiff Hicks an hourly wage of $7.75.

43.      Defendants, however, paid Plaintiff Hicks an effective hourly rate below the minimum wage.

44.     Plaintiff Logan was employed by Defendants from approximately October 21, 2011, to approximately December 10, 2011, as a uniformed, armed security guard.

45.     Monday through Sunday, Plaintiff Logan generally worked either a shift that began at 6:00 p.m. and concluded at 9:00 p.m. or a shift that began at 11:00 p.m. and concluded at 7:00 a.m.

46.     Defendants promised Plaintiff Logan an hourly wage of $9.00.

47.      Defendants, however, paid Plaintiff Logan an effective hourly rate below minimum wage.

48.     Plaintiff Scott was employed by Defendants on or about September 2011, to on or about January 2012, as a uniformed, unarmed security guard.

49.     Monday through Saturday, Plaintiff Scott generally worked either a shift that began at 12:00 a.m. and concluded at 8:00 a.m. or a shift that began at 11:00 p.m. and concluded at 7:00 a.m.

50.     Defendants promised Plaintiff Scott an hourly wage of $9.00.

51.      Defendants, however, paid Plaintiff Scott an effective hourly rate below minimum wage.

52.     Plaintiff Johnson was employed by Defendants from approximately October 05, 2011, to approximately January 1, 2012, as a uniformed, armed security guard.

53.     Monday through Sunday, Plaintiff Johnson generally worked either a shift that began at 6:00 p.m. and concluded at 9:00 p.m. or a shift that began at 3:00 p.m. and concluded at 6:30 p.m.

54.     Defendants promised Plaintiff Johnson an hourly wage of $9.25.

55.      Defendants, however, paid Plaintiff Johnson an effective hourly rate below minimum wage.

8

56.    In the few instances that Defendants compensated Plaintiffs for work performed, Defendants paid Plaintiffs in cash.

57.    Defendant Protective Services is a full service security company that provides armed and unarmed private security services to various establishments.

58.    Upon information and belief, Defendants advertise their services online via Protective Services' website, and Defendants have both recruited and hired employees using craigslist.com.

59.    According to Protective Services website, Defendants strive to be a globally respected security service provider, redesigning the security industry and implementing custom security plans for each client.

60.    Upon information and belief, Defendants have long-term relationships with many of its clients, including retail stores, residential properties, commercial buildings, and industrial factories.

I.    **Plaintiffs' Duties At Athlete's Foot Locations.**

61.    Plaintiffs were responsible for preventing and detecting intrusion and vandalism as well as the monitoring of unauthorized and suspicious activity at the properties owned by Defendants' various clients, namely Athlete's Foot and Oak Creek Apartment.

62.    Plaintiffs Logan and Johnson provided armed security services to retail store Athlete's Foot, LLC.

63.    The process by which Plaintiffs recorded time and performed their work was substantially the same at the various Athlete's Foot locations serviced by Plaintiffs.

64.    Upon arrival to their post at Athlete's Foot, Plaintiffs would clock in by informing Lt. Rogers, a Protective Services employee, of their arrival to work.

65.    Plaintiffs next notified the establishment's respective store manager of their arrival. The manager was responsible for clocking in Plaintiffs using the store's POS system.

66.    Plaintiffs' were posted at the establishment's front-door. There Plaintiffs were required to perform the following work: (1) monitor entrance and exit activity; (2) check customer receipts; and (3) observe suspicious customer activity.

67.    Monday through Saturday, Plaintiffs were clocked out by the individual store managers at 9:00 p.m., which correlated with the establishment's closing time.

68.    On Sunday, Plaintiffs were clocked out by the individual store managers at 6:00 p.m., which correlated with the establishment's Sunday closing time.

69.     Plaintiffs, however, were required to continue working off-the-clock to complete one final task: to accompany the store manager to a nearby Wells Fargo Bank.

70.     Ordinarily, Plaintiffs walked with the store manager to the bank, providing continuous surveillance and protection as the manager made his daily nighttime "drop off" of cash earned during the day.

71.     At other times, Plaintiffs used their respective vehicles to follow the store manager to the bank.

72.     If the store manager did not own a vehicle, Plaintiff and the store manager drove together to the bank using Plaintiff's vehicle.

73.     In the instances when the manager did not own a vehicle, Plaintiff either returned the manager to the store or drove the store manager to the manager's home.

74.     Providing security services to the store manager, coupled with the return back to the store, and/or the manager's requested drop-off location, averaged 35-60 minutes.

75.     Plaintiffs were not compensated for work performed daily past 9:00 p.m., despite having performed compensable work until approximately 9:35-10:00 p.m.

76.     Upon information and belief, Defendants requested that the various store managers clock Plaintiffs out at 9:00 p.m.

77.     Upon information and belief, Defendants were aware that Plaintiffs routinely performed work after having been clocked out.

78.     Plaintiff's informed Protective Services, including Gregory George, head of the Finance Department, and supervisor Lt. Rogers, of the work performed daily after 9:00 p.m.

79.     In response to Plaintiffs' complaints, Defendants incorrectly and without support stated that the work performed after 9:00 p.m. was not compensable work.

80.     Upon information and belief, Defendants were aware of their duty to compensate Plaintiffs for all worked performed.

81.     Defendants failed to compensate Plaintiffs, despite knowing that Plaintiffs routinely worked after being clocked out.

**II.     <u>Plaintiffs' Duties At Oak Creek Apartments.</u>**

82.     Plaintiffs Hicks and Logan performed security services for a residential complex named Oak Creek Apartments, which is located in DeKalb County, Georgia. Plaintiff Scott also provided security services for a residential complex, but at an alternate location.

83.    The process by which Plaintiffs recorded time and performed their work was substantially the same at the Oak Creek Apartments.

84.    Upon arrival to their post at the Oak Creek Apartments, Plaintiffs clocked in by calling Lt. Rogers, an employee of Protective Services.

85.    Plaintiffs next recorded their arrival time on daily log that was located at Oak Creek Apartments' main office.

86.    After recording their time, Plaintiffs began a 45-minute foot patrol.

87.    During the foot patrol, Plaintiffs were required to: (1) observe suspicious activities; (2) check for suspicious characters; (3) engage suspicious persons in conversation; and (4) to deter suspicious, non-residents from entering the Oak Creek Apartments.

88.    Plaintiffs were also required to observe the Apartment's entire perimeter, which included "hotspots" and "special interest areas."

89.    Lastly, Plaintiffs were required to keep a detailed log of the various suspicious activities, characters, and persons that Plaintiffs encountered.

90.    Generally, 15-minutes per each hour worked were dedicated to writing Plaintiffs' daily log.

91.    Plaintiffs performed the 45-minute foot patrol and 15-minute log writing routine approximately four (4) times per shift.

92.     Plaintiffs alternated the foot patrol with a vehicle patrol, which required Plaintiffs to perform the same duties as they would on the foot patrol. Plaintiffs performed a 45-minute vehicle patrol, followed by the 15-minute log writing routine, approximately four (4) times per shift.

93.     At the end of their shifts, Plaintiffs notified a Protective Services employee by phone that their shift was complete.

94.     Plaintiffs were then relieved of their duty.

95.     The actual hours worked were individually recorded by Plaintiffs on the timesheets and logbooks.

96.     The onus of recording time worked was placed upon Plaintiffs.

97.     Upon information and belief, Plaintiffs' failure to record time worked subjected them to adverse employment actions.

98.     Upon information and belief, Defendants did not make, keep, or maintain accurate records of all hours worked by Plaintiffs.

**III.    General Guidelines For Work.**

99.     Upon employment, Plaintiffs were presented with an "Employee Handbook/Code of Conduct" and "Training Instructions for Basic Security Officers."

100.    Throughout the handbook, the security guards are referred to as the "OPS Family", employees, and associates.

101.   The employee handbook highlights various company aspirations, outlines attendance, dress code, and hygiene requirements, and states a "Harassment" policy.

102.   Protective Services' Employee Handbook states: [I]t is imperative that your dress code is on par and appropriate at all times. You will be expected to making a 'clean' and 'crisp' appearance…."

103.   The handbook further dictates a "Code of Conduct" and explains the company's 90-day probation period.

104.   Finally, the handbook includes fraternization policy, which prohibits any personal relationships among the security guards.

105.   A true and correct copy of the "Employee Handbook/Code of Conduct" is attached here as Exhibit A.

106.   The Training Instruction for Basic Security Officers sets the procedures for security guards to follow in performing their security assignments.

107.   Plaintiffs received considerable guidance in performing their jobs, such as: (1) how to approach a suspicious individual and (2) the process for inspecting vacant apartment complexes.

108.   Plaintiffs were informed the order of their patrols and what information to include in their daily log.

109. Plaintiffs were further instructed not to personally investigate suspicious activities; instead, they were trained to "back off, secure the perimeter, and notify proper law enforcement."

110. A true and correct copy of the "Training Instructions for Basic Security Officers" is attached here as Exhibit B.

111. Protective Services controlled the tasks that Plaintiffs had to complete during their shifts, the order that these tasks should be completed, and how the guards were supposed to react to suspicious activity.

112. Plaintiffs were given and required to wear a company shirt that included the Protective Services Logo.

113. Plaintiffs did not independently determine the manner and method of performing their jobs.

114. Plaintiffs were financially dependent upon Protective Services for payment and were not in business for themselves.

## COUNT ONE: DEFENDANTS' WILLFUL VIOLATION OF FLSA'S MINIMUM WAGE PROVISION

115. Plaintiff Hicks was employed by Defendants on or about October 2011, to approximately December 10, 2011, as a uniformed, armed security guard.

116. Defendants compensated Plaintiff Hicks for a single pay period, despite having worked for Defendants over seven (7) weeks.

117.   Plaintiff Logan was employed by Defendants from approximately October 24, 2011, to approximately December 10, 2011, as a uniformed, armed security guard.

118.   Defendants compensated Plaintiff Logan for a single pay period, despite having worked for Defendants over seven (7) weeks.

119.   Plaintiff Scott was employed by Defendants on or about September 2011, to on or about January 2012, as a uniformed, unarmed security guard.

120.   Defendants compensated Plaintiff Scott for two pay periods, despite having worked for Defendants over sixteen (16) weeks.

121.   Plaintiff Johnson was employed by Defendants from approximately October 05, 2011, to approximately January 1, 2012, as a uniformed, armed security guard.

122.   Defendants compensated Plaintiff Johnson for a single pay period, despite having worked for Defendants over twelve (12) weeks.

123.   Plaintiffs were compensated for their work at a rate of less than $7.25 per hour.

124.   The minimum wage provisions of the FLSA apply to Defendants.

125.   Defendant violated the FLSA by failing to pay the minimum wage to Plaintiffs for all hours worked and to which they were entitled.

126.   Defendants violations of the FLSA's overtime provision, 29 U.S.C. § 207(a) were willful.

127.   Defendants (1) failed to maintain accurate time records; (2) Defendants failed to compensate Plaintiffs for all time worked; and (3) Defendants led Plaintiffs to believe that Defendants' policies conformed with the FLSA and the laws of the State of Georgia.

128.   Defendants had no objectively reasonable grounds for believing that Protective Services was in compliance with the FLSA.

129.   Defendants are jointly and severely liable to Plaintiffs for their damages under the FLSA.

130.   Plaintiff seeks damages in an amount of Plaintiffs' unpaid wages, liquidated damages as provided under the FLSA, and any other such legal and equitable relief as the Court deems proper.

131.   Plaintiffs seeks recovery of attorneys' fees and costs to be paid by Defendants as provided by the FLSA.

## COUNT TWO: DEFENDANTS' WILLFUL FAILURE TO PAY OVERTIME

132.   Plaintiff Hicks was employed by Defendants on or about October 2011, to approximately December 10, 2011, as a uniformed, armed security guard.

18

133.   Plaintiff Logan was employed by Defendants from approximately October 24, 2011, to approximately December 10, 2011, as a uniformed, armed security guard.

134.   Plaintiff Scott was employed by Defendants on or about September 2011, to on or about January 2012, as a uniformed, unarmed security guard.

135.   Plaintiff Johnson was employed by Defendants from approximately October 05, 2011, to approximately January 1, 2012, as a uniformed, armed security guard.

136.   Plaintiffs regularly worked in excess of forty (40) hours per week.

137.   Defendants failed to pay Plaintiffs overtime wages for all hours and part hours worked in excess of forty (40) hours per week.

138.   Defendants' failure to pay Plaintiffs for the security services provided to store managers resulted in lost overtime to the extent that the operation of this policy deprived Plaintiffs of credit for hours worked in excess of forty (40) hours per week.

139.   Upon information and belief, Defendants created an environment that discouraged Plaintiffs from reporting any hours or part hours worked in excess of forty (40) hours per week.

140.   In fact, the hourly time sheet that Defendants required Plaintiffs to use states: "Any hours worked above 40 hours a week remains standard pay."

19

141.   A true and correct copy of an "Hourly Time Sheet" is attached here as Exhibit C.

142.   The overtime provisions of the FLSA apply to Defendants and protect Plaintiffs.

143.   Defendants are jointly and severely liable to Plaintiffs for their damages under the FLSA.

144.   Defendants (1) failed to maintain accurate time records; (2) Defendants failed to compensate Plaintiffs for all time worked; and (3) Defendants led Plaintiffs to believe that Defendants' policies conformed with the FLSA and the laws of the State of Georgia.

145.   Defendants further had a written policy that precluded payment of overtime wages, which contradicts FLSA's mandatory overtime provision.

146.   Pursuant to 29 U.S.C. §§ 216(b) and 255(a), Defendants are liable to Plaintiffs for three years of unpaid overtime wages, an equal amount as liquidated damages, and reasonable attorney's fees.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs Hicks, Logan, Scott, and Johnson respectfully pray that:

a.  The Court enter judgment in Plaintiffs' favor;

b.  The Court enter judgment against Defendants that their violations of the FLSA were willful;

c.  The Court award Plaintiffs all unpaid minimum wages as provided for under the FLSA;

d.  Plaintiffs receive judgment against Defendants for unpaid overtime wages dating back to three years from the date that this action is filed;

e.  Plaintiffs receive judgment for liquidated damages equal to the amount of unpaid overtime wages;

f.  Plaintiffs receive an award of reasonable costs and attorney's fees;

g.  The Court award all other relief as it deems just and proper, including any and all equitable relief.

## **DEMAND FOR JURY TRIAL**

Pursuant to Federal Rule of Civil Procedure 38, Plaintiffs James Hicks, Ladarrious Logan, Larson Scott, and Alfred Johnson, hereby demand a jury trial on all issues triable by a jury.

**RESPECTFULLY SUBMITTED**:   April 24, 2012

**MAYS & KERR LLC**                              /s/ Viraj Parmar
229 Peachtree Street NW                      Viraj Parmar
International Tower | Suite 980              Ga. Bar No. 996884
Atlanta, GA 30303                               viraj@maysandkerr.com
Telephone:  (404) 410-7998
Facsimile:   (877) 813-1845                  John L. Mays
Attorneys for Plaintiffs                         Ga. Bar No. 986574
                                                        john@maysandkerr.com

## CERTIFICATE OF COMPLIANCE

Pursuant to Local Rule 7.1D, counsel hereby certify that this Complaint and Demand for Jury Trial has been prepared using Times New Roman 14 point font, as approved by Local Rule 5.1C.

This 24th day of April, 2012

**MAYS & KERR LLC**
229 Peachtree Street NW
International Tower | Suite 980
Atlanta, GA 30303
Telephone:   (404) 410-7998
Facsimile:   (877) 813-1845
Attorneys for Plaintiffs

/s/ Viraj Parmar
Viraj Parmar
Ga. Bar No. 996884
viraj@maysandkerr.com

John L. Mays
Ga. Bar No. 986574
john@maysandkerr.com

23